IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALEX D. MOGLIA, not individually but as Chapter 7 TRUSTEE OF THE BANKRUPTCY ESTATE OF PHILLIP NEGRON,     PLAINTIFF,      v. VILLAGE OF MELROSE PARK, ET. AL.     DEFENDANTS. | CASE: 12cv3288 JUDGE LEINENWEBER MAG. JUDGE GILBERT |

**PLAINTIFF'S LOCAL RULE 56.1(b)(3)(C) STATEMENTS OF ADDITIONAL FACTS**

NOW COMES Plaintiff, through his counsel, Christopher Cooper and David Sigale, pursuant to LR 56.1(b)(3)(C) and presents his uncontested facts. Through counsel, Plaintiff states as follows:

(1) Chief Pitassi has used the taking away of vacation days as a form of discipline (Pitassi Dep., 177:1-20; 178:4-15)

(2) Chief Pitassi states that he would never cite an officer with a violation if that officer engaged in conduct that Policy 340 neither describes nor talks about (Pitassi Dep., 9:17-24; 10:1-2)

(3) Chief Pitassi states that he never uses "unbecoming conduct" as a catchall to cite an officer with a violation (Pitassi Dep., 10:3-7)

(4) Chief Pitassi thinks that Officer Negron is a competent officer (Pitassi Dep., 16:22-24)

(5) Chief Pitassi states that, under his command, Officer Negron is possibly the only officer who has ever been disciplined for parking a

1

police car where it allegedly should not have been parked (Pitassi Dep., 38:2-24).

(6) Sgt. Scavone asserts that if an officer gets in trouble, he could lose vacation days. (*Q. Does he take away a couple of days? How does it work? THE WITNESS: Yes. Usually, for minor incidents, he will lose time. BY MR. COOPER: Q. What kind of time? A. It's a day, whether it be a personal day that we call new days, a vacation day, or eight hours of time due. Q. And that's how you get punished, right? A. That's one of the ways. Q. That you get punished? A. Yes.*) PF. Ex. 2, Scavone Dep., 31-32).

(7) Lt. Dimaio, as punishment for losing a police cruiser and failing to disclose the incident immediately, in violation of Policy 340, lost 3 vacation days. He went back to shift command one week later (Pitassi Dep., 56:19-24; 57:1-24; 58:1-20, MPPD Policy 340).

(8) Chief Pitassi believes that losing a police cruiser, and parking a police cruiser in a fire lane warrant essentially the same discipline as as made evident by Pitassi disciplining DiMaio by docking him three vacation days (Pitassi Dep., 52:3-7; 55:5-8; 12-22) and docking Plaintiff two vacation days (see Discipline, Mem., dated 11/22/11 marked as DF. Exhibit N, Doc. 49-14).

(9) Chief Pitassi states that discretion should be used when administering discipline (Pitassi Dep., 61:8-12).

(10) Chief Pitassi determined that Officer Tropea should not receive discipline for discharging his weapon where the round went through the police cruiser's door panel (Pitassi Dep., 60: 9-18; 61:8-12).

(11) Chief Pitassi never followed up with Officer Tropea to ensure he returned to the gun range per his recommendation (Pitassi Dep., 61:15-24; 62:1-9).

(12) Chief Pitassi determined that the discharge of Officer Tropea's secondary weapon was accidental, and not negligent, despite neither having done an investigation, nor interviewing Officer Tropea himself (Pitassi Dep., 62:10-24; 63:1-21).

(13) Chief Pitassi states that the involuntary discharge of a weapon could be grounds for negligence (Pitassi Dep., 64:23-24; 65:1-11).

(14) Chief Pitassi states that it is necessary to discipline officers for damaging a police cruiser to send a message to the officer, yet did not discipline Officer Tropea for discharging his weapon into the door panel (Pitassi Dep., 60: 9-18; 61:8-12(67:22-24; 68:18-24; 69:1-14).

(15) Chief Pitassi, after reading an Illinois State Police report, was aware that shell casings were removed from a crime scene involving Officer Tejeda (Pitassi Dep., 69:15-24; 70:1-11; 74:12-24; 75:1-16; 79:8-12).

3

(16)     Chief Pitassi believes that it is absolutely unacceptable to remove shell casings from a crime scene (Pitassi Dep., 76:14-24: 77:1; 79:8-12).

(17)     Chief Pitassi decided that Officer Lichter had not struck a female pedestrian despite two witnesses close to the scene claiming they heard a yelp from the pedestrian, as well as the pedestrian requiring medical attention from Gottlieb Memorial Hospital (Pitassi Dep., 83:2-5, 12-24; 84:1-8 and PF. Ex. 7).

(18)     Chief Pitassi did not arrest the pedestrian who made the allegation against Officer Lichter for filing a false police report, despite the pedestrian filing two police reports claiming she was struck. (Pitassi Dep., 84:13-24; 85:1-11).

(19)     Chief Pitassi admitted that he is aware that shell casings were removed from a crime scene. (Pitassi Dep., 77: 12; 78:7-17; 79: 8-12).

(20)     Chief Pitassi has yet to investigate the incident involving Officer Lichter and a prostitute despite learning about it approximately one year before his deposition (Pitassi Dep., 99:1-17).

(21)     Chief Pitassi did not discipline Officer Lichter for an incident in which Lichter called the police to assist him in retrieving 100.00 from a prostitute.  PF. Aff., Ex. 1.

(22)     Chief Pitassi took issue with the attire worn by The Reapers motorcycle club, of which three officers were known

4

members: Officer Datoli, Sgt. Maiello, and Officer Pece (Pitassi Dep., 114:23-24; 115: 13-17; 116:3-14; 118:9-13).

(23)  Chief Pitassi states that the attire of The Reapers made the members look like a motorcycle gang (Pitassi Dep., 118:20-24; 119:1-4).

(24)  Chief Pitassi had known about the motorcycle club, which closely resembled a gang, and which included several police officers under his authority (Pitassi Dep., 118:20-24; 119:1-4; 123:21-14).

(25)  Chief Pitassi claims that losing vacation days is "minor discipline," yet gave Officer DiMaio the same "minor discipline" for losing a police cruiser (Pitassi Dep., 52:3-7; 55:5-8; 12-22; 135:23-24; 136:1-9).

(26)  Chief Pitassi states that the discipline he gives is motivated by a desire to have an efficient and effective operation of the police department, as well as for the officers to portray the department in a good light to the public, yet did not discipline officers perceived as being in a gang, an officer soliciting a prostitute, or an officer who was witnessed striking a pedestrian (Pitassi Dep., 141:21-24; 142:1-6; 142:1; 143:1-8; 145:2-5).

(27)  Chief Pitassi, in his 38 years as a policeman, does not recall any other incident where he disciplined an officer for not

5

completing an assignment or for the manner in which he or she spoke with a citizen (Pitassi Dep., 168:7-24).

(28) Chief Pitassi ultimately decides the discipline for an officer's infractions (Pitassi Dep., 174:23-24; 175:1-4).

(29) Lt. Scatchell determined Officer Tropea's involuntary weapon discharge was accidental, rather than negligent, despite failing to conduct any investigation beyond simply asking what happened (Scatchell Dep., 51:22-24; 52:1-12).

(30) Lt. Scatchell did not recommend discipline for Officer Tropea (Scatchell Dep., 55:19-24; 56:1-2).

(31) Lt. Scatchell cannot remember a single instance where anyone has ever complained about him in any capacity (Scatchell Dep., 74:24; 75:1-3).

(33) Lt. Scatchell asserts that he has not once yelled at Officer Negron for anything (Scatchell Dep., 75:24; 76:1-7).

(34) Sgt. Scavone does not think Officer Negron is a good police officer solely because Officer Negron does not make many arrests (Scavone Dep., 7:9-24; 8:1).

(35) Sgt. Scavone asserts that he is always aware of the location of his officers (Scavone Dep., 30:23-24; 31:1-19).

(35) Sgt. Scavone knows of Officer Warren Hernandez "accidentally" discharging a weapon in the radio room and consequently receiving discipline (Scavone Dep., 46:15-24; 47:15-20).

6

(36)     After the "Five Guys incident," Sgt. Scavone told Officer Negron to write a to/from because the woman was known to complain about police offers.  Scavone even told Officer Negron that the woman was crazy (Negron Dep., 101:17-24; 102:1-12, 19-24).

(37)     During the "funeral escort incident," after funeral procession failed to follow Officer Negron, Urso told Negron, "what the fuck."  Negron then asked what he was supposed to do, and Urso replied, "fuck them, come back."  After being ordered to do so, Officer Negron returned to town and continued his regular patrol duties (Negron Dep., 171:23-24; 172:1-24; 173:1-19).

(38)     It is Lt. Scatchell's nature to yell at people and yell to get his point across (Negron Dep., 336:15-18).

Respectfully, by
s\Christopher Cooper, ESQ., One of Plaintiff's Attorneys & David Sigale, ESQ.  One of Plaintiff's Attorneys
Law Office of Christopher Cooper, Inc.
79 West Monroe Street, STE. 1213, Chicago, IL 60603 [or]
3620 West 80th Lane, Merrillville, IN 46410
Tel: 312 371 6752  TEL: 219 228 4396   FAX: 866 334 7458  E-Mail: cooperlaw3234@gmail.com

CERTIFICATE OF SERVICE:  The undersigned certifies that he filed the foregoing on ECF on July 26, 2013 and that the Defendants are registered E-fiers.  s\Christopher Cooper